## Jefferson County v. Hunter et al.

*Wilson & Wilson*, County Solicitors, for plaintiff.
*Raymond E. Brown*, for defendants.

DARR, P. J., Jan. 21, 1930.—The single question here involved is the propriety of the following surcharge by the county auditors in their report of

the financial condition of Jefferson County for the year 1927: "We further certify and report that after a fair, impartial and conscionable audit, adjustment and settlement of the accounts of the County Commissioners, we find that they should be, and do hereby surcharge County Commissioners S. A. Hunter, Perry L. Wingert and John Daugherty with the sum of Twenty-six Hundred Seventy-eight and 64/100 Dollars ($2678.64), said sum having been illegally, injudicially, imprudently and lavishly expended by them in and about the erection of a retaining wall surrounding the County's property and in disposing of salvage from the retaining wall removed from said premises. . . ." The report was filed on Feb. 24, 1928, and, in a proper way and within the proper time, Mr. Hunter and Mr. Daugherty jointly appealed therefrom. Thereafter, we directed an issue, as provided by the Act of April 15, 1834, § 56, P. L. 537, in which the county was named as plaintiff and the two surcharged commissioners defendants. Perry L. Wingert, the other commissioner, who has appealed independently of his associates from the same surcharge, is not, by his own choice, a party to these proceedings. Counsel for the respective parties having filed an agreement that a trial by jury be dispensed with and that the decision of the case be submitted to the court for hearing and determination, as provided by the Act of April 22, 1874, § 1, P. L. 109, we heard the testimony and are now prepared to determine the issue. No points or requests were submitted by either side. The following is a statement of the facts found and our conclusions of law:

### Facts.

1. The defendants, S. A. Hunter and John Daugherty, were two of three county commissioners for Jefferson County, Pennsylvania, for the years 1924, 1925, 1926 and 1927.

2. On Feb. 23, 1927, the county entered into a written agreement with R. H. Richards, a contractor, by the terms of which the latter agreed, for a consideration of $246,590.67, to "provide all the materials and perform all the work for the remodeling and rebuilding of the Jefferson County Court House . . . (except heating, plumbing and electric wiring) . . . as shown on the drawings and described in the specifications prepared by Emmett E. Bailey, Oil City, Pennsylvania, Architect. . . ."

3. The plans and specifications for the work were prepared by Emmet E. Bailey, a competent and experienced architect, and had been approved by a previous board of county commissioners on Feb. 9, 1923, and by Hon. Charles Corbet, who was then President Judge, on Feb. 27, 1923. Two successive grand juries had recommended that the court-house be repaired and remodeled, and the condition of the building and its lack of modern facilities had been a source of complaints by numerous other grand juries. We approved the contract for the work on March 4, 1927, which was awarded to Mr. Richards as the lowest responsible bidder after due advertisement and the submission of several other competitive bids.

4. Under the head "Alterations & Additions," the specifications provided that "the architects shall have the power to require alterations in the work shown or described in the drawings or specifications and the contractor shall proceed to make such changes without causing delay. In every such case, the price agreed to be paid for the work under the contract shall be increased or decreased, as the case may require, according to a fair and reasonable valuation of the work added or omitted, and value of such work shall be fixed by fair admeasurement and valuation made by the architect or by some competent person appointed by him. Such alterations or variations shall in no

way render void the contract and no claim for variations or alterations, or the increased or decreased price thereof, shall be valid, unless done in pursuance of an order from the architect and notice of such claim made to him in writing before the commencement of the work."

5. A bulletin dated Feb. 14, 1927, styled "Bulletin No. 1," attached to the specifications furnished to prospective bidders, provided, among other things, that the "present fence around property to be removed by County Commissioners and to be their property. This does not include stone steps, however, these to be wrecked by General Contractor and to be his property."

6. The court-house, as remodeled and enlarged, stands upon a lot of land in Brookville, bounded on the south by Main Street, on the east by Pickering Street, on the north by Cherry Alley, and on the west by an unnamed alley extending from Main Street to Cherry Alley. When the work was undertaken, which resulted in the enlargement and improving of the facilities of the court-house, there was a stone wall surmounted by an iron fence on all four sides of the lot, which had been constructed at an early date and served the purpose of supporting Cherry Alley on the north, the level of which was above the ground floor of the court-house, and a portion of the unnamed alley on the west, a part of which was likewise above such level. The wall and fence also prevented promiscuous trespassing upon the property. The plans prepared by the architect required an excavation in the rear of the property or on the Cherry Alley side to a level nine feet below the bottom of the old stone wall. The ground north of this wall was wet or "springy," and even before the excavation was commenced it did not prevent drainage from at least four springs of water onto the county's property. On several occasions, prior to the decision of the commissioners to make the improvements, water drained into the court-house cellar in quantities sufficient to extinguish the fire in the furnace, and at all times the cellar, where valuable records were stored, was damp and unsanitary. When the excavation was made below the bottom of the old wall, which was practically flush with the pavement on Cherry Alley, nothing remained to support the highway, and, if the contractor had not taken precautions to shore it up, "the whole alley would have been in against the court-house." The iron fence which stood on the top of the old wall prevented horses, vehicles and pedestrians on Cherry Alley from being precipitated from its level to that of the county's land, which was several feet lower. The same could be said of a portion of the fence on the west or unnamed alley side. While the old fence and wall on Cherry Alley were being replaced by new ones, the contractor "had the pleasure of pulling a team out" which had fallen from the alley.

7. After the work under the original specifications, which did not provide for the replacement of the wall and fence, had progressed to a place where the difficulties encountered made it imperative that the building and grounds be protected from water and a subsidence of Cherry Alley and possibly a portion of the unnamed alley, the architect conferred with the commissioners, and, in the language of one of them, "we found we would have to put in a concrete wall to take care of the drainage from the hill, as we had a great deal of trouble with the old furnace, with water coming in and drowning out the fire in the furnace. We told Mr. Richards we wanted to make it safe." Another difficulty was thus described: "Mr. Richards, in throwing the dirt out, had to have a platform about five feet high and had to relay the dirt up to the alley, and about as fast as they would throw the dirt out it would slip back; it was quicksand or something of that nature." Accordingly, at his own suggestion, the architect prepared plans and specifications for the addi-

tional work, submitted the same to the contractor and requested him to make an estimate of its probable cost. Thereafter, the architect, having submitted the contractor's figures to the commissioners with his approval, ordered Mr. Richards to proceed with the work. Upon its completion, the latter rendered a bill for the new wall and fence, which included the entire cost of excavation, materials and labor, amounting to $12,688.63, and, upon the architect's approval thereof by certificate, the same was paid.

8. The wall and fence in front of the court-house were not replaced. Finding no market for the stone removed from the old wall, the commissioners had a portion thereof hauled to the County Home property, where it still remains. They found that "it wouldn't pay us to move" the balance. A part of the old fence was hauled to the same place, where it remains undisposed of. The commissioners were advised by the architect that the replacement of the wall on three sides of the property "was an extra that had to be put in there for protection of the building and grounds," and that "this work would be called extra from the general contract." All of the dealings of the contractor, from the beginning until the completion of the extra work, were with the architect, although the commissioners, acting upon the advice of the architect, consented that it be done.

9. The surcharge appealed from is in the sum of $2678.64, which, apparently, in the opinion of the auditors, is the difference between the actual cost of the new wall and fence and what it would have cost had the commissioners not acted "illegally, injudiciously, imprudently and lavishly." Only two witnesses were called by the county to sustain the surcharge. The first was a civil engineer, who, after the completion of the work and without accurate knowledge of the amount of excavation required or of difficulties encountered, estimated that it could have been done for $10,926.25. He absolved the commissioners of lavishness, however, when he replied "I would not" to the following question put to him on cross-examination: "Q. Mr. Pealor, taking into consideration the fact that the county commissioners paid Mr. Richards the sum of $12,688.63 for the complete retaining wall and fence, would you say that the difference between that sum and your estimate indicates a lavish expenditure of money?" The other witness called by the county described himself as having been "in the contracting business for the last fourteen years—highway, road building." His "total estimate of the entire cost of the retaining wall and fence" was $9936.09. He was asked, on cross-examination: "Would the fact that your estimate of the cost of this work based upon the plans and specifications was approximately $10,000 and the work actually cost $12,688.63 indicate to you that the commissioners had been extravagant and lavish in having the work done and paying for the work?" He answered, "No, I wouldn't say the commissioners were lavish. I think they were misled. Q. Then you don't attach any particular blame to them? A. No, not to them."

### Conclusions of law.

1. By the terms of section 48 of the Act of April 15, 1834, P. L. 537, 545, it was the duty of the auditors to "audit, settle and adjust the accounts of the commissioners . . . and make report thereof to the Court of Common Pleas . . . together with a statement of the balance due from or to such commissioners. . . ."

2. County auditors have jurisdiction to examine the accounts of the county commissioners and to judge whether particular expenditures of public moneys were legally and honestly made, and may surcharge the commissioners with

any amount which they find was not legally and honestly expended: In re Report of County Auditors, 8 Kulp, 415.

3. The Act of April 15, 1834, § 11, P. L. 539, requires county commissioners "to keep and maintain the public buildings . . . of the county [which includes the court-house] in suitable and convenient order and repair, and it shall be lawful for them, when necessary, having first obtained the approbation of the grand jury and of the Court of Quarter Sessions of the county, to alter, add to or enlarge such public buildings."

4. A proper surcharge by county auditors must be more than an expression of opinion that a particular work cost too much. It must appear that such surcharge was the result of auditing, settling and adjusting the commissioners' accounts: Com., to use, v. United States Fidelity & Guaranty Co., 220 Pa. 148, 152.

5. On an appeal from the auditor's settlement, the issue to be tried is confined to the items of error specified by the parties: Cardon v. Clearfield County, 8 Dist. R. 386; and it is error for the Common Pleas to allow the introduction of new matters: Luzerne County v. Whitaker, 100 Pa. 296.

### Discussion.

The auditors, by failing to surcharge the commissioners with the whole cost of the retaining wall and fence, must have approved of the legality of the transaction. The entire cost of the work was $12,688.63, whereas the amount of the surcharge is only $2678.64. There is nothing in the report to show how the amount was arrived at, because it is neither the difference between the actual cost and the estimate of Mr. Pealor or that of Mr. Young, both of whom were employed by the auditors and whose estimates are nearly $1000 apart. If the building of the wall and fence was illegal, the commissioners should have been surcharged with $12,688.63, its entire cost. Presumably, the auditors were of opinion that the work cost too much, and that is the only question, if any, before us. Without assigning any reasons whatever, they make the bold assertion in their report that "said sum" ($2678.64) was "illegally, injudiciously, imprudently and lavishly expended . . . in and about the erection of a retaining wall surrounding the county's property and in disposition of salvage from the retaining wall removed from about said premises." We greatly doubt the sufficiency of such a general and indefinite surcharge. In Com., to use, v. United States Fidelity & Guaranty Co., 220 Pa. 148, a board of county auditors certified in their report that the county commissioners "have made improper and illegal payments on account of the building of the county poor house, and work connected therewith, to the amount of $14,868, and we, therefore, surcharge the county commissioners, viz. [naming them], equally with the said sum of $14,868; and we make this a part of our report." In an opinion delivered by Mr. Justice Brown, the Supreme Court said: "The law prescribes no form in which the report of county auditors shall be made: Godshalk v. Northampton County, 71 Pa. 324; but if any county officer whose accounts are to be audited is to be surcharged by the report of the auditors, it must appear that such surcharge is the result of auditing, settling and adjusting his accounts. The duty of the auditors is to 'audit, settle and adjust' the accounts of the respective county officers, and until they have done so there can be no surcharge. Liability resulting from the report of county auditors is a statutory one, and the requirements of the statute must be followed before it can be incurred. In surcharging the county commissioners as the custodians of the funds of the poor district in this case, it does not appear that such surcharge was the result of auditing,

settling and adjusting their accounts. The report of the auditors is nothing more than an expression of opinion by them that the county poorhouse had cost too much money, and payments for it to the extent of $14,868, were therefore, improper and illegal. That sum, with which the commissioners are surcharged, was not found to have been improperly and illegally paid as the result of auditing their accounts with the poor district and passing upon the disbursements made. What item or items in the payments made by the commissioners were improper and illegal? It was their right to know this from the auditors' report, and they were not required to appeal from a summary surcharge. The report has properly been treated by them as a nullity so far as it pretends to audit, settle and adjust their accounts with the poor district. Being but a mere expression of opinion by the auditors that the county commissioners had paid too much for the poorhouse, it would not be any evidence of liability in a suit against them to recover sums alleged to have been improperly expended by them, and much less can it be the basis of a final judgment against them because unappealed from."

Treating the surcharge, however, as having been properly made, because it has been appealed from and an issue has been based thereon, our single inquiry is whether there is anything in the record to sustain it. When an appeal from the report of county auditors is entered within the required time, the filing of such appeal puts the burden upon the commissioners of showing that they have legally disbursed the funds of the county: In re Auditors' Report, 245 Pa. 17. We are satisfied that the two commissioners who filed this appeal have adequately assumed their burden. The building of the wall and fence on the north or Cherry Alley side of the property was absolutely necessary and they would have been subject to criticism if they had not, on their own motion, ordered it done. The same may be said of a portion of the wall and fence on the west or unnamed alley side. To have constructed a wall and fence only where it was absolutely essential would have marred the beauty and symmetry of the completed structure, and they were justified in extending the same along Pickering Street. Charged with the duty of keeping and maintaining the court-house and appurtenant grounds "in suitable and convenient order and repair," and acting upon the advice of a competent and experienced architect, who ordered that the work be done as an "extra" under the original contract covering the remodeling and enlarging of the court-house, which contract and the plans and specifications for the work had been approved by the Court of Quarter Sessions, the commissioners, in good faith and without fraud or profit to themselves, ordered that bills for the work be paid. In so doing they committed no wrong, and our opinion in this respect is concurred in by the only witnesses called by the county. Hence, we find for the defendants.

### Order.

And now, Jan. 21, 1930, it is ordered and directed that upon the filing of this decision in the office of the prothonotary, notice thereof shall be forthwith given by him to the parties or their attorneys, and, if no exceptions thereto are filed within thirty days after service of such notice, judgment shall be entered thereon in favor of S. A. Hunter and John Daugherty, the defendants.